THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v EDWARD LYNCH, Respondent.

First Department, March 20, 1986

APPEARANCES OF COUNSEL

*Donna Krone* of counsel *(Norman Barclay* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Gerard T. Breen* of counsel *(Raymond E. Kerno* with him on the brief; *Richard Hartman,* attorney), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J.

The People appeal from an order setting aside a guilty verdict and dismissing the indictment. The facts may be briefly summarized.

At about 7:00 P.M., on November 28, 1982, Police Officers McGowan and Stedina, in uniform and on patrol in a marked radio car, noticed a medallion taxicab which had been proceeding north on Third Avenue turn left onto 21st Street. Although two passengers were seated in the back, the taxicab's roof light was on, indicating that the meter was off, a violation of a Taxi and Limousine Commission regulation requiring that it be running when a taxicab is carrying passengers. The officers decided to investigate. As they followed the taxicab west on 21st Street they activated the siren and flashing turret light, but neither of the passengers appeared to react in any way. Admittedly, however, Officer Stedina was watching the driver, not the passengers. The taxicab driver pulled over and stopped, just east of Lexington Avenue.

Officer Stedina got out of the patrol car and walked to the taxicab, asked the driver for his license and rate card, and informed him that he had committed a violation. The driver told him that since the passengers were his friends he was not required to run the meter. Meanwhile, in accordance with a security procedure which the two officers routinely followed,

Officer McGowan had positioned himself on the other side of the taxicab, just behind the back seat, so that he could keep the passengers under observation. Defendant, one of the passengers, was sitting on the right side, closest to Officer McGowan, while the other, Charles Dingman, was seated behind the driver. A plexiglass partition separated the passenger's compartment from the driver's. Two jump seats jutted out from the back of the driver's seat, which was cushioned. From the rear passenger seat the back of the driver's seat was beyond arm's reach.

Just seconds after he glanced into the taxicab, Officer McGowan noticed a wooden handle and a portion of the shiny metal part of a gun protruding from a triangular tear in the dark vinyl on the back of the front seat. The tear was about 10 to 12 inches below the plexiglass partition, a little above the jump seat and to the right of the center of the taxicab, closer to defendant than to Dingman. The gun had been inserted into the white upholstery stuffing, which was exposed since the torn vinyl flapped down.

Officer McGowan opened the right rear door of the taxicab and called to his partner, "We have a gun." He then reached in and removed the gun, which was in a holster, from its niche in the upholstery and pulled defendant out of the taxicab. Meanwhile, Officer Stedina had opened the front door on his side and ordered the driver from the taxicab. He then opened the left rear door and removed Dingman. The three men were frisked, arrested, and taken to the nearest station house. The gun, a .25 caliber Raven Arms automatic pistol, loaded with a clip containing five bullets, was tested and found operable. Despite a computer check of its serial number, however, its ownership could not be traced. Since any such prints would not have survived the handling the gun received at the time of its recovery, the clip, gun and holster were not checked for fingerprints.

Defendant testified in his own behalf and called both Dingman and Edward Badrajian, the taxicab driver, as witnesses. At the time of the incident he and Dingman, both bartenders, had been friends for about 3 or 4 years. Both men were familiar with firearms, since defendant had been a police officer and Dingman a security guard. Dingman, who worked at the Madison Bar on 28th Street between Madison and Park Avenues in Manhattan, and Badrajian had also been close friends for five years. Badrajian drove his own taxicab. For as

long as he owned the taxicab, the back of the front seat had a tear in the upholstery.

On the day of the incident, Dingman, who had the day off, stopped at the Madison Bar in the early afternoon for a few drinks. Defendant came in later with a friend, who left and took defendant's car. Still later, at about 4:00 or 5:00 P.M., Badrajian, who had been working since 9:00 or 10:00 A.M., joined his friends. Before taking this break, Badrajian had picked up about 20 fares of one or more passengers. None of them had mentioned anything about a gun. Badrajian, however, had not checked the back seat at any time that day to see if a passenger had left anything behind.

Eventually defendant, Dingman and Badrajian left the Madison Bar together, and drove in Badrajian's taxicab in search of a place to eat. Badrajian did not activate the meter. They stopped at 23rd Street and Second Avenue, where defendant exited, ostensibly to look for his cousin at another bar, and then reentered the taxicab. As defendant got out, he leaned forward in his seat so that he would have been within a foot of the tear in the upholstery. Badrajian then drove back towards the Madison Bar. At about 21st Street and Third Avenue, he became aware that a police car, its siren on and red light flashing, was following them, and he so notified his passengers. Dingman told Badrajian to pull over to a fire hydrant on the north side of 21st Street, between Third and Lexington Avenues. Defendant, however, did not notice the police car's flashing light and, although he was sitting alongside Dingman, he heard neither the siren nor any conversation between Dingman and Badrajian about the police car. In fact, he was unaware of the police car's presence until after Badrajian had pulled the taxicab over and stopped.

Badrajian, against whom criminal charges were also lodged but later dropped, testified that he did not own the gun or know how it got into his taxicab. Nor did he see either defendant or Dingman with a gun that day. Dingman denied putting the gun into the torn upholstery. Nor did he see defendant do so. Since he basically looked straight ahead during the taxicab ride, he never had occasion to notice any hole in the upholstery or any part of a gun protruding from the rear of the driver's seat. Defendant also denied bringing the gun into the taxicab, and did not know who did. Like Dingman, he looked straight ahead during the ride. Although it was located at eye level, he never noticed the tear in the upholstery or a gun or anything else protruding from it.

The jury returned a verdict convicting defendant of criminal possession of a weapon in the third degree, but acquitting Dingman. More than a month after the jury had been discharged, Trial Term granted defendant's motion for a trial order of dismissal, made after the close of the evidence and upon which it had reserved decision, and dismissed the indictment. In so ruling, the court found that since the officers had not seen defendant or Dingman lean forward in his seat, neither of them had hidden the gun in response to the officers' approach. Noting that Badrajian had picked up 20 fares that day and had not checked the passenger compartment after any of them, it further concluded that someone else could have left the gun in the taxicab. The court also found that the gun was not "easily observable" from the inside of the taxicab, but only by looking in from the outside. Any of these factors, the court concluded, was sufficient to create a reasonable doubt. Furthermore, it held, inasmuch as the tear in the upholstery was as accessible to Dingman, who was acquitted, as it was to defendant, there was "almost no reason" for the jury to acquit Dingman and convict defendant. We find that the evidence was sufficient to sustain defendant's conviction and, accordingly, reverse and reinstate the verdict.

Initially, we find that a prima facie case was made out against defendant pursuant to Penal Law § 265.15 (3), which provides that the presence in an automobile of a firearm is presumptive evidence of its possession by all the persons occupying the automobile at the time such weapon is found. The presumption may stand unrebutted even though, as in the instant case, proof to the contrary is offered. *(People v Lemmons,* 40 NY2d 505, 510.)* Whether the presumption should be applied to a particular defendant is a matter to be decided by the trier of fact *(supra,* at p 511; *People v Velez,* 100 AD2d 603, 604). Here, the jury apparently decided to apply the presumption to defendant. That decision was proper, given the courts' consistent approval of the application of the presumption to situations in which an occupant of a vehicle exercised even less physical control over a gun than did defendant in this case. *(See, e.g., People v Lemmons, supra* [driver presumed to possess gun found in a handbag on the floor near the front passenger door]; *People v Davis,* 104 AD2d 1046, 1047; *People v Hall,* 101 AD2d 956 [back seat passenger presumed to possess gun hidden beneath driver's seat]; *People v Velez, supra* [driver of a van presumed to possess gun thrown from rear door]; *People v Rodriguez,* 75 AD2d 730

[front seat passenger presumed to possess gun hidden underneath his bucket seat].) Thus, the statutory presumption alone was sufficient to establish defendant's possession of the gun.

Moreover, sufficient evidence, independent of the presumption, existed to prove defendant's guilt. To possess a weapon, a person must exercise "dominion and control" over it; the weapon must be " 'within [his] immediate · control and reach' ", and be " 'available for unlawful use if he so desires' ". *People v Lemmons,* 40 NY2d, at pp 509-510, quoting *People v Persce,* 204 NY 397, 402; Penal Law § 10.00 [8].) Here, the evidence clearly demonstrates that the gun, protruding from a tear in the upholstery of the taxicab directly in front of the passenger seat which he occupied, was within defendant's immediate physical control and reach.

Experience and common sense led the jury properly to conclude, despite his testimony to the contrary, that defendant was aware of the gun's presence in the taxicab. Its location and visibility, the amount of time defendant spent in the taxicab, estimated as between 10 and 15 minutes, and his proximity to the gun all supported this conclusion. According to defendant, he was looking straight ahead. The tear in the upholstery was directly in front of him at eye level, 4 to 5 feet away. Defendant, an ex-police officer familiar with guns, conceded that from this distance he could recognize the protruding wood and metal object as the rear portion of a pistol. Furthermore, in exiting and reentering the taxicab through the right rear door at the 23rd Street stop, defendant twice passed within one foot of the protruding gun. Given these circumstances, the jury properly rejected as incredible defendant's tale of not noticing the gun, and correctly inferred that he knew of its presence in the taxicab.

In finding otherwise, Trial Term substituted its own findings of fact for the jury's. It thus credited defendant's own self-serving, exculpatory testimony that he did not see the gun protruding from the tear, while ignoring compelling physical evidence that the gun was clearly visible to anyone who occupied the right rear passenger seat or entered the taxicab from the right rear door, as defendant did when he reentered the taxicab at 23rd Street and Second Avenue. Also, in finding that it could not reconcile defendant's conviction with Dingman's acquittal, it considered a factor which was inappropriate to any determination of whether to grant a trial order of dismissal.

A trial order of dismissal may be granted only if the trial evidence is legally insufficient to support the offense charged. (CPL 290.10 [1].) Evidence is "legally sufficient" when, if accepted as true, it would establish every element of the offense charged. (CPL 70.10 [1]; *People v Sabella,* 35 NY2d 158, 167.) Thus, if the trial evidence is legally sufficient, a court is without the power to grant such an order. Consequently, it may not grant a trial order of dismissal on the ground that guilt has not been established beyond a reasonable doubt. *(Matter of Holtzman v Bonomo,* 93 AD2d 574, 575.) In substituting itself as the fact finder and dismissing the indictment, despite the existence of legally sufficient evidence of defendant's guilt, Trial Term usurped the function of the jury and exceeded its powers.

Even if they had been proper considerations, moreover, the facts upon which Trial Term relied did not mandate acquittal. As already noted, it credited defendant's testimony that he was never in a position to see the gun. Yet, Officer McGowan's testimony, apparently credited by the jury and not discounted by the court, attested to the gun's visibility. Trial Term further found that defendant did not hide the gun, since neither officer noticed him lean forward at the time the radio car was following the taxicab. Officer Stedina, however, was watching the driver, not the passengers, and Officer McGowan never testified that he had defendant under constant observation. Thus, defendant could easily have slid to the front of his seat and stuffed a gun into the tear in the upholstery.

The court further found that since at least 20 passengers had been in the taxicab that day, any one of them could have placed the gun in the upholstery. The jury, however, properly rejected this argument as highly unlikely. Badrajian testified that in over four years of driving his taxicab, no one had ever left a gun in it. And, since Badrajian had not been stopped by the police earlier on the day in question, none of his other passengers that day had any apparent reason to conceal a gun in the upholstery. Only defendant, who, like Dingman, was aware that the police were following the taxicab and knew that it was illegal to possess an unlicensed pistol, had an obvious reason. Even if defendant did not discard the gun, however, but was simply aware of its presence in the taxicab, he would still be guilty of possessing it.

Finally, even if the acquittal of Dingman could properly be considered on a motion for a trial order of dismissal, dismissal would nonetheless be unwarranted since the jury was required

to weigh and evaluate the evidence as to each defendant independently, and to render separate verdicts. *(People v Rodriguez,* 75 AD2d 730, *supra; People v Jenkins,* 47 AD2d 735.)* On this record, the jury had a valid evidentiary basis for convicting defendant and acquitting Dingman.

Contrary to Trial Term's conclusion and the position of the dissent, the evidence against both defendants was not identical and the jury had a rational basis for crediting Dingman's exculpatory testimony about not seeing the gun, while rejecting defendant's. Dingman's testimony paralleled that of the police officers and Badrajian with respect to the approach of the police car with its siren blaring and lights flashing, and confirmed the taxicab conversation, which clearly indicated that its occupants knew they were being followed. In light of the apparent truthfulness of the balance of Dingman's testimony, the jury apparently also chose to believe his testimony that he knew nothing about the gun.

In contrast to Dingman, defendant contradicted even his own witnesses in an attempt to disassociate himself, not only from the gun, but also from any awareness of the police officers' approach. Thus, he testified that he did not notice the police car's flashing light or hear its siren, did not hear the conversation going on right next to him about the approach of the police, and did not hear Officer McGowan shout "We got a gun", although he was the person closest to McGowan. Given defendant's patently incredible testimony about these events, the jury had every reason to disbelieve his testimony that he knew nothing about the gun.

In addition, the physical evidence against defendant and Dingman differed. The pistol was discovered stuffed into a tear in the upholstery directly at defendant's eye level; in contrast, Dingman was seated slightly to the left of the tear and testified that he did not look in that direction during the ride. As already noted, defendant also exited and reentered the taxicab through the right rear door, passing within one foot of the torn upholstery; on the other hand, Dingman, who entered through the left rear door, remained seated on the left rear passenger side of the taxicab. Thus, given the differences in both the physical evidence against them, and their credibility, it cannot be said that the jury acted irrationally in convicting defendant and acquitting Dingman.

Accordingly, the order of the Supreme Court, New York County (Walter M. Schackman, J.), rendered April 23, 1984,

granting defendant's motion to vacate the verdict and dismiss the indictment, should be reversed, on the law, the motion denied, the verdict reinstated and the matter remanded to Trial Term for further proceedings.

KUPFERMAN, J. P. (dissenting). I would affirm.

The majority opinion, while it analyzes the situation in detail, strains to find a distinction (without a real difference) between the positions of the defendant and Dingman. For Dingman to be acquitted and the defendant found guilty is to deliver inconsistent verdicts. If anything, Dingman's testimony is more in accord with his potential guilt than that of the defendant. Dingman acknowledged knowing the police were following, giving him reason to attempt to dispose of the weapon.

The Trial Judge having heard all of the testimony and having observed the demeanor of the witnesses, was far better able, in a situation such as this, to test the result.

SANDLER, ASCH and KASSAL, JJ., concur with SULLIVAN, J.; KUPFERMAN, J. P., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on April 23, 1984, reversed, on the law, the motion to dismiss the indictment denied, the verdict reinstated and the matter remanded to Trial Term for further proceedings.