■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HENRY HUSBAND, Appellant.—Judgment, Supreme Court, New York County (Martin Rettinger, J.), rendered January 28, 1986, which after a jury trial convicted defendant of attempted robbery in the first degree and sentenced him to a term of from 1½ to 4½ years, unanimously reversed, on the law, and the case is remanded for a new trial.

The defendant was convicted of attempted robbery in the first degree, and sentenced to a term of from 1½ to 4½ years, after a trial which presented the jury with two sharply conflicting versions of the critical events from the complaining witness, Steven Husband, and the defendant.

Although a study of the record leaves us with a serious question as to the defendant's guilt of the charge for which he was convicted, even accepting in its entirety the testimony of the complaining witness, the evidence was legally sufficient to support the jury's verdict. However, reversible error occurred when the trial court refused to permit a defense witness to give testimony clearly relevant to the central issue of the trial —the reliability of the two conflicting versions of the critical events. Accordingly, the conviction should be reversed and the case remanded for a new trial.

The complaining witness, Steven Husband, and the defendant were cousins, both coming to this country from Barbados, the complaining witness in 1974, and the defendant, many years younger, in 1981 or 1982. It was agreed that Husband paid for defendant's ticket to New York, and that for some three months the defendant lived with Husband and was supported by him. The defendant left Husband under circumstances that are not entirely clear and that suggest some degree of tension between the two, although both testified to a basically friendly relationship.

For some period prior to the date with which we are concerned, Husband and his adopted son, Charles (Tyrone) Young, owned a cafeteria located on the second floor of 55 West 125th Street in Manhattan. Barrington (Barry) Richards was employed by them as a chef. Husband testified that on occasion defendant came to his cafeteria to eat or to borrow small sums of money. He denied having borrowed money from the defendant on February 11, 1985, or on any other occasion.

Husband testified that on February 15, 1985, some time around noon, the defendant entered the cafeteria, walked into the kitchen where the complaining witness was cutting chicken with a cleaver, and asked to borrow $150. Husband replied that he did not have any money. In response to the defendant's repeated requests for money, Husband told the defendant something like "Get the hell out of here. I don't have no money for you", and resumed cutting the chicken. The defendant then called out "Steve", and Husband saw the defendant pointing a small gun with a black handle at him. Thinking the gun was not real, Husband began walking toward the defendant, who threatened to blow his head off if he took one more step. Husband then told Richards to go outside and tell Tyrone to give the defendant $150. Richards, followed by the defendant, walked out of the kitchen.

Husband testified that he went to the first floor, reported

what occurred to the building security guard, and called the police. The police arrived shortly thereafter and Husband drove around the neighborhood with them looking for the defendant. Eventually he returned to the cafeteria, where some time between 2:00 and 3:30 P.M. he was informed that the defendant had returned. He went downstairs, stopped a police car, told the officers what happened, and returned with them to the cafeteria where he saw the defendant talking to Young. The defendant was arrested, and after asking "What did I do", threatened Husband, "I am going to get you."

Charles Young, Husband's adopted son, testified that when Richards entered the cafeteria from the kitchen he did not instruct him to give money to the defendant but instead told him that "something happened to Steve." He went into the kitchen, but nobody was there. From Young's testimony it is clear that the defendant did not ask him for money after the events that occurred in the kitchen, and in fact had left the cafeteria. Young testified that he informed Husband of defendant's return to the cafeteria, which occurred sometime between 2:00 and 3:30 P.M.

The defendant testified that on February 11, at the request of Husband, he had loaned Husband $140 "for taking care of the business", which Young, at Husband's direction, had put in the cash register, and that Husband had promised to repay him the next day. Defendant visited the cafeteria on the next day, and several following days, in an effort to secure repayment of the loan, but on each occasion Husband refused to repay him.

The defendant testified that on February 15 he once again went to the cafeteria and asked Husband for the money he had loaned him. Husband told him to come into the kitchen, and the two men went into the kitchen where the chef was preparing lunch. While Husband started cleaning meat with a cleaver, the defendant repeated his request. An argument ensued during which Husband said the defendant was being a pest and began to curse the defendant's girlfriend. Husband then told the defendant to remove his hand from his pocket, and threatened to kill him if he did not do so. Defendant further testified that Husband approached him with the cleaver, and that he then left the kitchen and went into the cafeteria to wait for Husband to repay his loan. Some 20 minutes later the police arrived and told defendant that he was under arrest because he had a gun on him, and was informed that Husband had accused him of attempted robbery. The defendant testified that he did not have a gun, but

was in fact in possession of $250 in cash, the proceeds of a check that he had cashed that day.

In essential agreement with defendant's version of the events, Barry Richards testified that defendant had asked Husband for money that Husband owed him, that Husband had picked up a "French knife" and started slashing at him, and that the defendant had then left the kitchen and walked into the cafeteria. The witness, who had left his employment some time before the trial under circumstances that are not entirely clear, admitted that he had informed police on the day of the defendant's arrest that the defendant had pulled a gun on Husband. He testified that he had made this statement to police under duress in order to save his job.

Undeniably, the evidence is persuasive that during a heated argument over money between Husband and defendant, during which Husband was in possession of a cleaver that he was using to chop chicken, the defendant at some point produced a gun and pointed it at Husband. The obvious weakness in defendant's version is the failure to account satisfactorily for his movements during the several hours that clearly elapsed between the events in the kitchen and his arrest in the cafeteria. Moreover, the admission of Richards that he had confirmed defendant's possession of a gun on the day of the arrest severely impaired, if it did not entirely destroy, the value to the defendant of his testimony.

On the other hand, even accepting in its entirety Husband's version of the events, the evidence is less persuasive that the defendant threatened Husband with a gun in an effort to enforce his demand for money. Husband did not testify to any demand for money from the defendant after the defendant pointed the gun at him. According to Husband's testimony, the defendant's threat to use the gun occurred only after Husband, presumably with the cleaver still in his hand, moved several steps towards the defendant. And although Husband testified that he told Richards to ask Young to give the defendant the requested money, the evidence is undisputed that Richards did not in fact do so, and that the defendant did not request any money from Young.

The significant possibility is clearly presented by the People's evidence that in the course of a heated dispute with Husband over money, during which Husband was in possession of a cleaver, the defendant drew a gun as a matter of self-protection, and not in an effort to enforce his demand for money. This possibility was never presented by the defense to

the jury, and presumably was not considered by them, because the argument would have been incompatible with defendant's denial that he had possessed a gun.

Accepting that the evidence was nonetheless sufficient to sustain the jury's verdict, the critical issue on this appeal arises from the trial court's refusal to permit defendant's girlfriend to testify that at the request of the defendant she visited Husband on February 14 to secure repayment of a loan that defendant said he had made to Husband, and that Husband responded by telling her to have the defendant visit him on the following day. From the colloquy in the record, it is apparent that the trial court believed that the defendant's purported conversation with his girlfriend was inadmissible hearsay. The court's reason for excluding testimony with regard to her alleged conversation with Husband is less clear.

It is unnecessary to determine whether or not it was error for the court to have excluded the conversation in which the defendant, the day before the incident, had told his girlfriend that Husband owed him money, although it is at least arguable that such a statement prior to the alleged attempted robbery might appropriately have been admitted as rebutting any inference that the claim of the loan was an afterthought, which claim was clearly implicit in the People's case, and important to it. The refusal to permit the witness to testify to her conversation with Husband seems to us clearly erroneous.

It is true that in the offer of proof the defendant's counsel did not allege that the witness would testify to an explicit admission by Husband that he owed the defendant money. But the jury could surely infer from the proffered testimony that Husband implicitly admitted owing the defendant money when he failed to deny the debt under circumstances in which such a denial would reasonably have been expected, and when he responded to the request for repayment by telling the witness that the defendant should come the following day to the cafeteria. *(See,* Richardson, Evidence § 222 [Prince 10th ed].)

That the offered testimony was relevant to the issues presented to the jury seems indisputable. Undeniably, it would make no legal difference to the charge of robbery whether or not the defendant attempted with force to obtain money that was owed him or did so in pursuance of a demand for money to which he had no claim. But central to the directly contradictory versions of the critical events presented by Husband and the defendant was Husband's claim that the defendant

sought to borrow money, and defendant's testimony that he was seeking to recover money which he had previously lent to Husband. Although the jury might have disbelieved Husband on this issue and nonetheless concluded the defendant had attempted to obtain the money by force, it is plain that if the jury came to doubt Husband on this aspect of his testimony, such a doubt might have led the jury to reject the rest of this testimony. Although the People's appellate brief argues that the issue was collateral, its obvious relevance is underlined by the considerable time devoted by the Trial Assistant in summation to arguing, and arguing skillfully, that Husband's testimony with regard to the money was far more likely to be true.

It may well be that the jury would have rejected for familiar reasons the testimony of the woman with whom defendant had been living for some years, but the evaluation of her credibility was for the jury, not for the court. As the United States Supreme Court said in *Chambers v Mississippi* (410 US 284, 302): "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Manifestly, that fundamental right embraces the right of a defense witness to present relevant and admissible testimony, which if believed, could give rise to a reasonable doubt of the defendant's guilt. Concur—Sandler, J. P., Asch, Rosenberger, Ellerin and Wallach, JJ.