[615 NYS2d 374]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CARL FISHER, Appellant.

First Department, August 11, 1994

### APPEARANCES OF COUNSEL

*Carl Fisher, pro se,* and *Richard L. Herzfeld,* New York City, for Carl Fisher, appellant.

*Nancy Paterson* of counsel, New York City *(Tami J. Aisenson* with her on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

RUBIN, J.

The main issue raised on this appeal is whether the signed statement of the apprehending officer, dealing with a central element of the offense charged, should have been admitted into evidence. The circumstances of its preparation notwithstanding, the document was concededly signed by the officer and should have been received into evidence as a statement made in the ordinary course of Police Department business or, at the very least, as a prior inconsistent statement.

Defendant stands convicted of second degree robbery pursuant to Penal Law § 160.10, which provides, in relevant part: "A person is guilty of robbery in the second degree when he forcibly steals property and when * * * 2. In the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (a) Causes physical injury to any person who is not a participant in the crime". Penal Law § 160.00 provides, in pertinent part: "Robbery is forcible stealing. A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: 1. Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking".

At 2:20 A.M. on the morning of November 26, 1991, defendant was seen by a token clerk tampering with a token box and removing tokens with a length of metal. It is the theory of the prosecution that this theft offense was aggravated when defendant inflicted injury to Officer Andrew Nash in the

process of fleeing the scene. The People contend that the injury was received when defendant, attempting to escape from Officer Nash by climbing an iron gate, " 'stomped' on Nash's right hand, which [the officer testified] felt like it had been crushed 'like a pretzel' ".

It is the position of the defense that the People have failed to demonstrate defendant committed larceny, that he employed no force whatsoever for the purpose of retaining stolen property and that the injury to the officer's knuckle was sustained when Officer Nash punched defendant, either while effecting his arrest or thereafter. It is asserted that any force defendant might have used against the officer was for the purpose of evading his unprovoked assault upon defendant.

While the record contains evidence from which the jury could reasonably conclude that a robbery was committed, the testimony received regarding the injury alleged to elevate the crime to robbery in the second degree is directly contradicted by evidence excluded by Supreme Court as hearsay. The critical issue in this case concerns the element of causation. If Officer Nash broke his finger as the result of striking defendant, it cannot be said that defendant inflicted the injury so as to support his conviction for second degree robbery (Penal Law § 160.10 [2] [a]).

At trial, a token booth clerk testified that he observed defendant "robbing the fare box." He saw defendant run from the area of the token box, pursued by the officer, to a stairway leading up to the street, at which point the witness lost sight of both men. At no time did the token clerk see anyone strike defendant.

A custodian, who had been sweeping the subway platform, noticed defendant apparently removing tokens from the fare box with "a piece of trapping metal". He saw Officer Nash, dressed in plain clothes, approach defendant and identify himself as a police officer, at which point defendant "just like turned and ran." When Officer Nash yelled to people on the platform to call 911, the custodian proceeded to the street to await assistance. He testified that, from street level, he went down the stairway and saw defendant trying to squeeze through the space at the top of a locked gate, "kicking away at the officer, because the officer kept trying to reach up and grab him and pull him down." At this time, he observed that defendant's eye was red. The custodian went back up to the street at the arrival of a police car, returning to open the gate

to let responding Transit Authority police officers onto the platform. The witness then left to give a statement to other officers on the street. He did not see anyone strike defendant at any time.

Officer Nash stated that he hit defendant a number of times while "on the steps" leading up to the gate, striking defendant with "both hands" in the upper body and face with a closed fist. Nash climbed up the gate after defendant, "trying to grab him. And he started stomping on my right hand." Defendant then screamed "I'm going to stab you to death" and pulled out strips of metal, which the officer took to be a knife. He stated, "I pulled my weapon out with my left arm, because I couldn't pull with my right, and I'm a right-handed person." Defendant then threw the metal strips at the officer.

Officer Karen Huber appeared as defendant's only witness. She testified that, although she was not present at the scene, she vouchered the metal strips and a single token as evidence because Officer Nash "couldn't write." The voucher she completed recites that these items were "removed from the defendant as arrest evidence."

The transcript of the proceedings contains references to a hospital record that was received into evidence by stipulation. The injury to Officer Nash's hand was diagnosed by a radiologist as a "nondisplaced fracture through the neck of the fourth metacarpal". Defendant sustained a "left elbow dislocation of the radial head and ulna" as well as "peri-orbital ecchymosis" and "subconjunctival hemorrhaging" of the right eye.

On summation, defense counsel maintained that defendant was only tampering with the token box and was unsuccessful in his attempts to remove tokens. Therefore, he argued, no larceny was committed. Counsel also contended that no force was used against Officer Nash and that his injuries are consistent with the officer's use of force in striking defendant. Finally, counsel noted that the injuries sustained by defendant are completely without explanation and that a number of officers, including several who took the witness stand, "conveniently or for whatever reason" failed to notice defendant's "blood red" eye and the "deformity of his elbow."

Specifically at issue on appeal is the exclusion of a "line-of-duty report" stating the circumstances of the injury sustained by Officer Nash. On cross-examination, Nash explained that, due to the injury to his hand, he could not fill out the report

and that it was therefore completed by Sergeant Kelly. Nash alleged that Kelly prepared the report without consulting with him and, although Nash admitted signing the report, he stated that he did not read it before signing it because, in his words, "My hand was swollen. I wanted to go to the hospital."

The line-of-duty injury report states: "I observed a male removing tokens from a token box. I approached him, identified myself, and informed him he was under arrest. At that time he punched me in the head and ran. While attempting to effect the arrest I broke my knuckles while punching perpetrator."

Defense counsel did not seek to introduce the line-of-duty report at the time Officer Nash was on the witness stand, but waited until the presentation of defendant's case. Defense counsel informed the court that he planned to call Sergeant Kelly and Officer Huber as his witnesses.

Upon counsel's offer of proof with respect to the line-of-duty injury report, the court conducted an examination of Sergeant Kelly, out of the presence of the jury, regarding his preparation of the report. The Sergeant testified that he completed the report because Officer Nash was "incapacitated". He stated that he did not get to speak to Nash in preparing the report but "looked over the rest of his paper work and from that I made the conclusion that he received the injury while effecting the arrest." He emphasized that he was not present when Nash later signed the document, stating, "I had prepared the paper work and left it at the desk."

On cross-examination, the Sergeant testified that he did not remember seeing any document indicating that Nash injured his hand while punching defendant, but stated, "Obviously there was something when I filled this out." He explained that he completed the form in longhand and submitted it to a clerk for typing. He said that he later compared the typed copy to the original, adding, "after that it is disseminated through the police department ranks."

The court ruled that the line-of-duty report constitutes hearsay and declined to admit it into evidence. Defense counsel argued that it is a signed statement and that "it is up to the jury to believe whether in fact or not that information was given to [Sergeant Kelly], and that the statement was made in an official police report that [Officer Nash] signed". Counsel further stated that "it is a credibility issue for [the jury] to decide whether it is hearsay or not hearsay, or

whether it is part of the overall police testimony, of not knowing anything about this." The court reaffirmed its ruling, granting counsel an exception.

On appeal, the briefs by both parties are devoted largely to discussion of whether the disputed document is admissible for impeachment purposes as a prior inconsistent statement *(see, e.g., People v Dackowski,* 50 NY2d 962; *People v Chaitin,* 94 AD2d 705, *affd* 61 NY2d 683). However, as there was no witness on the stand who could be impeached at the time, it is clear that defense counsel sought to introduce the statement as evidence-in-chief. In this regard, in his reply brief, defendant cites this Court's decision in *People v Husband* (135 AD2d 406). In that case, we held it was reversible error to exclude testimony from the defendant's girlfriend with respect to an extrajudicial admission by the complaining witness, potentially exonerating the defendant of the charge of robbery. Moreover, we found no impediment to reaching the issue "that in the offer of proof the defendant's counsel did not allege that the witness would testify to an explicit admission by [the complaining witness] that he owed the defendant money" *(People v Husband, supra,* at 410).

As in *Husband (supra),* the issue in this case is whether a statement is admissible under an exception to the hearsay rule *(see also, People v Barber,* 186 AD2d 483, *lv denied* 81 NY2d 836 [past recollection recorded]). Granting that the line-of-duty injury report constitutes hearsay, as Supreme Court correctly determined, it is nonetheless a statement required to be recorded, on an official Police Department form, as Officer Nash testified, where there is "any kind of injury requiring medical treatment". Testimony was received from Sergeant Kelly regarding its preparation, and the prior testimony of Officer Nash admitting that he signed the document was before the court. There is sufficient evidence in the record to establish that the report was made in the ordinary course of Police Department business, that it was required to be made by the injured officer or his commanding officer, and that it was prepared within a reasonable time after the injury occurred *(People ex rel. McGee v Walters,* 62 NY2d 317, 320-321). Therefore, the report is admissible under the business record exception to the hearsay rule (CPLR 4518 [a]; Richardson, Evidence § 298 [Prince 10th ed]; Fisch, New York Evidence § 833 [2d ed]; *see, People v Farrell,* 58 NY2d 637).

The only evidence that defendant "stomped" on the hand of the apprehending officer—the testimony of Officer Nash him-

self—is completely contradicted by the line-of-duty injury report bearing his signature. Thus, the report comprises evidence which, if believed by the jury, presents a reasonable doubt of defendant's guilt of second degree robbery, and failure to admit the document as evidence-in-chief constitutes reversible error *(People v Husband, supra,* at 411).

A further point requires comment. Defense counsel was absolutely correct that the circumstances under which the line-of-duty report was prepared do not bar its admission. As the statute provides: "All other circumstances of the making of the memorandum or record, including lack of personal knowledge by the maker, may be proved to affect its weight, but they shall not affect its admissibility" (CPLR 4518 [a]). However, apart from the direct contradiction contained in the report, testimony as to the circumstances under which this piece of evidence was prepared is significant not only with respect to the weight to be accorded to the document, but to the jury's assessment of the credibility of Officer Nash.

The testimony received from Sergeant Kelly in connection with the admissibility of the line-of-duty report, which was not heard by the jury, when considered in the light of testimony given by other witnesses, casts doubt on the testimony of Officer Nash concerning the preparation of the report. The allegation, relied on by Supreme Court to exclude the evidence, that Nash did not read the report before signing it because he was anxious to get to the hospital is inconsistent with Sergeant Kelly's testimony that he prepared the report "at some point during the day when Officer Nash was injured." In response to a question posed by defense counsel, Sergeant Kelly indicated that he completed the report before going off duty in the morning, leaving it "at the desk" for Nash to sign.

The testimony of other witnesses indicates that, at the time Sergeant Kelly was allegedly preparing the line-of-duty report, Officer Nash was at St. Luke's Hospital receiving treatment for his broken finger. Officer Brendan Barnes, who drove Nash to the hospital, testified that Nash arrived at the 24th Precinct with defendant at about 2:40 A.M. He noticed that Nash "looked like he'd been in a fight" and "seemed to be in quite some pain". He called 911, and one of the emergency medical technicians who arrived told him that the hand was broken. He then asked the attendant to look at defendant, "at which time I went over to the sergeant and told him that Andy's hand was broken. I said EMS is looking at Mr. Fisher, did he

want me to take him [Officer Nash] up to St. Luke's Hospital in a radio car." The Sergeant gave his consent, and Officer Barnes then drove Officer Nash to the hospital where he remained, according to his testimony, "A couple of hours, I don't remember."

It strains credulity that, in the short time Officer Nash was at the precinct house, Sergeant Kelly was able to assemble the necessary paperwork, prepare the report in longhand, submit it for typing, receive it back from the clerk, compare it to the original and take it to "the desk" for Nash to pick up. Nor did the Sergeant represent as much. Thus, even crediting Sergeant Kelly's allegation that he prepared the report, the sequence of events strongly suggests that it was signed by Officer Nash *after* he returned from the hospital when it could have been read at his leisure. Moreover, the report is written in the first person, as though Officer Nash were describing events he had witnessed. Finally, Nash denied having written any reports or memoranda concerning this incident. In fact, it was the allegation of Officer Nash that "I couldn't write." This allegation is completely at odds with Sergeant Kelly's testimony that he "looked over the rest of his paper work" and formed the impression that Nash had sustained injury "while effecting the arrest." These circumstances, particularly the recording of impressions in the first person, certainly might have led the jury to conclude that the report was not only signed but also completed by Officer Nash after his return from St. Luke's Hospital.

As we noted in *People v Husband (supra,* at 411), "if the jury came to doubt [the complaining witness] on this aspect of his testimony, such a doubt might have led the jury to reject the rest of this testimony." Significantly, the evidence of the injury which defendant is alleged to have inflicted consists entirely of testimony given by Officer Nash. Neither the token clerk nor the custodian saw defendant strike the officer while fleeing from the vicinity of the token box, as Nash asserted. The testimony of the custodian that defendant was "kicking away at the officer" is not consistent with the officer's allegation that defendant "stomped" on his hand, nor does the custodian's testimony include any mention of defendant's alleged threat to stab the officer. Officer Nash testified that he did not complete an "assault report" regarding the incident, and the "field investigation work sheet" (TP-67) completed by Officer Huber does not list robbery among the charges arising out of the incident. Finally, none of the witnesses in this case

saw the blows admittedly inflicted upon defendant by Officer Nash which, the record suggests, were struck on the stairway *before* defendant attempted to scale the gate.

The exclusion of the line-of-duty injury report was highly prejudicial to the defense because the discrepancy it reveals goes to the very heart of the prosecution's case on the charge of second degree robbery. Had the jurors been afforded the opportunity to view the report, they may well have rejected the People's allegation that defendant inflicted injury to Officer Nash. More importantly, had defense counsel been afforded the opportunity to examine Sergeant Kelly regarding discrepancies between his explanation of how the report was prepared and the testimony given by Officer Nash, counsel may have been able to discredit the People's chief witness.

Accordingly, the judgment of the Supreme Court, New York County (Harold J. Rothwax, J.), rendered July 22, 1992, should be reversed, on the law, and the matter remanded to Supreme Court for a new trial.

MURPHY, P. J., WALLACH, ROSS and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, rendered July 22, 1992, reversed, on the law, and the matter remanded to Supreme Court for a new trial.