(June 23, 2011)

■ The People of the State of New York, Respondent, v Pavan Ortiz, Appellant. [927 NYS2d 9]—

Judgment, Supreme Court, New York County (A. Kirke Bartley, J.), rendered June 9, 2008, convicting defendant, after a jury trial, of criminal facilitation in the second degree, and sentencing him to a term of 7½ to 15 years, reversed, on the law, and the matter remanded for a new trial.

The undisputed evidence was that defendant was with Michael E. when the latter received a pistol from Doreen B., who believed that the victim, whose nickname was "Butterball," had robbed a drug dealer who worked for her. When Michael E. said that he did not know who Butterball was, defendant said he would show him who he was. Defendant then accompanied Michael E. to the stairwell of a building where he knew the victim might be and pointed him out to Michael E., who then killed the victim with three shots to the head. As the People correctly contend on appeal, there was ample and strong evidence that defendant knew that Michael E. planned to kill rather than injure or frighten the victim. In this regard, former Assistant District Attorney Sturm testified that when she and Detective Waithe interviewed defendant in Arthur Kill Correctional Facility, he stated that he knew that Michael E. was going to kill Butterball. Indeed, Ms. Sturm testified that defendant told them during the interview that when Michael E. received the pistol, he stated he was going to kill Butterball.

Detective Waithe, however, did not testify that defendant had stated that he had known Michael E. planned to kill the victim or that Michael E. had said he was going to kill the victim. Rather, he testified on direct examination that defendant had made statements to the effect that Doreen B. had said she "wanted something done about this [the robbery]" and that, after taking the gun, Michael E. "agrees he'll do this." On cross-examination, Waithe was asked whether defendant had said during the interview that Doreen B. wanted Butterball beaten up. Waithe responded, "Beaten up, hurt." He was then asked, "That's it?," and responded, "That's it." More importantly, for purposes of the principal issue on this appeal, a case summary report prepared either by Ms. Sturm, the lead prosecutor at the time, or the assistant district attorney who was assisting her, Karen Friedman Agnifilo, contains the following statement concerning the jailhouse interview: "[Defendant] claims he

didn't know that [Michael E.] was going to kill Butterball." Ms. Sturm did not recall whether she had prepared the case summary but, in addition to testifying that it was "very possible" she had prepared it, testified that either she or Ms. Friedman Agnifilo had prepared it. In addition, a voluntary disclosure form (VDF) on which Ms. Sturm's name was typed stated that during the interview defendant "made an oral statement the substance of which was that [Doreen B.] had asked him to hurt 'Butterball' for ripping off one of her drug dealers." As with the case summary, Ms. Sturm testified that although she did not remember whether she had prepared it, either she or Ms. Friedman Agnifilo had prepared it.

The trial court concluded that Ms. Sturm's testimony concerning the statements made by defendant during the interview could not be impeached with the statements in the case summary and VDF. The basis for the court's ruling with respect to the case summary, and apparently with respect as well to the VDF, was that "[i]n the absence of [Ms. Sturm] adopting this statement as her own, given her testimony that she is not certain who authored it and does not recall it, . . . it cannot be used to impeach the testimony here at trial." Because Ms. Sturm had not "affirmatively adopted" the case summary, she could not be impeached with it. As the court went on to state, Ms. Sturm "cannot be properly impeached with this document by virtue of the fact she's indicated that the document was possibly authored by another individual and not herself and therefor[e] not having adopted it[,] it is improper to confront her with a prior inconsistent statement."

On appeal, the People make no attempt to defend the notion that, absent an express admission by a witness that he or she made a prior inconsistent statement, the mere possibility that someone else made the statement precludes impeaching the witness with the statement. However, the People contend that a witness cannot be impeached with a prior inconsistent statement "[i]f the statement cannot be *reliably* attributed to the witness" (emphasis added). What "reliably" may mean in this context is not clear, particularly because the People also argue that "[s]ince nothing *conclusively* demonstrated that Sturm was the author of the statements contained in the Summary and VDF, they simply could not be shown to be Sturm's statements" (emphasis added). Whatever the precise standard may be, the People set it too high. The inference that Ms. Sturm prepared both the case summary and the VDF is a reasonable one, because Ms. Sturm testified that either she or Ms. Friedman Agnifilo had prepared the documents, that Ms. Friedman

Agnifilo was not present during the jailhouse interview, that it was "very possible" she had prepared the case summary and that the VDF bore her typewritten name. Moreover, even assuming that Ms. Sturm did not personally prepare each document, it is entirely unreasonable to think that Ms. Sturm, the lead prosecutor in a serious homicide case, did not well know what each document said about a matter of great import: the statements defendant made during the jailhouse interview. Indeed, it is confounding that the People continue to contend that the defense properly was prevented from impeaching the testimony of the lead prosecutor on such a critically important subject with the accounts of defendant's statements in documents prepared either by the lead prosecutor or by an assistant district attorney she was supervising.

As noted, the People presented strong evidence that defendant knew that Michael E.'s intent was to kill the victim. Ms. Sturm's testimony that defendant had said that Michael E. had said he was going to kill the victim was extremely damaging testimony. In their brief, the People highlight this testimony, arguing that "[t]his is one of those rare cases in which the defendant *did* explicitly explain what was going on in his head at the time of the crime; specifically, he admitted during his jailhouse interview that he knew [Michael E.] intended to kill [the victim]." We agree and in part for this very reason, we conclude that the erroneous preclusion of evidence which could lead the jury to reject this testimony was not harmless error. Morever, of course, regardless of whether Detective Waithe's testimony regarding the interview contradicted Ms. Sturm's testimony, his testimony certainly did not corroborate Ms. Sturm's.*

Defendant's challenges to the sufficiency of the evidence are

---

* We note that the day after the court's ruling, the existence of another document emerged, an "Original Case Report," containing the same statement reportedly made by defendant (i.e., that he "didn't know that [Michael E.] was going to kill Butterball"). This document contains the typewritten recitation that it is "From: Asst. D.A. Helen Sturm/Karen Friedman." Defendant argued that he had not been provided with the document and thus that the prosecution had committed a *Rosario* violation. The trial court, however, did not rule on the issue of whether there had been a *Rosario* violation. Rather, it concluded that in the interests of fairness the defense should be permitted the opportunity to recall Ms. Sturm, an opportunity the defense declined. As we are directing a new trial in any event, we need not reach the merits of defendant's *Rosario* claim. Although the concurrence finds that the document had not been turned over and that the prosecution thereby violated its obligations under both *Rosario* and *Brady*, defendant made no *Brady* claim at trial (nor does he on appeal), there is no need to address it and the record is not adequate to resolve it.

unpreserved (*People v Hines*, 97 NY2d 56, 61 [2001]; *People v Abarrategui*, 306 AD2d 20, 21 [2003], *lv denied* 100 NY2d 617 [2003]), and we decline to review them in the interest of justice. As an alternative holding, we conclude that they are meritless in any event. Defendant's challenges to the weight of the evidence are likewise meritless. We need not reach any of defendant's other arguments for reversal. Concur—Gonzalez, P.J., Friedman and McGuire, JJ.

Tom and Abdus-Salaam, JJ., concur in a separate memorandum by Tom, J., as follows: This is the second time defendant has been tried and convicted by a jury of criminal facilitation in the second degree in connection with the March 22, 1998 murder-for-hire of William Sharpe, a homeless drug addict, for which the trial court imposed a prison term of 7½ to 15 years. In the first jury trial, defendant was convicted of second-degree murder and second-degree criminal facilitation, and was sentenced to concurrent terms of 20 years to life, and 7½ to 15 years. By decision dated October 17, 2006, this Court reversed because of prosecutorial misconduct, compounded by error in instructing the jury, that cumulatively deprived defendant of a fair trial (33 AD3d 432 [2006]). On the instant appeal, we again vacate the judgment of conviction on the basis of an evidentiary ruling that deprived defendant of the opportunity to impeach the testimony offered by a key witness. We disagree with the majority, though, as to the proposition that we should not address the *Brady* consequences of the People's failure to turn over exculpatory material that unfairly prejudiced his ability to mount a defense.

The indictment charged that the murder of William Sharpe was procured by Doreen B., defendant's cousin, and that she, her son, Ronnie B., and defendant caused Sharpe's death. Additionally, it charged that the three engaged in conduct providing Michael E., who carried out the shooting, with the means and opportunity to commit the murder, a class A-I felony, constituting criminal facilitation in the second degree. Prior to trial, Michael E. entered into a cooperation agreement, pleading guilty to second-degree murder and receiving the minimum sentence of 15 years to life in exchange for his testimony. The trial of Doreen B. and Ronnie B., at which Michael E. testified, was severed from that of defendant, and a jury acquitted them of all charges.

Essential to a conviction for second-degree criminal facilitation, a class C felony, is the defendant's belief that it is probable the person to whom he renders aid intends to commit a class A felony (Penal Law § 115.05), in this case second-degree murder,

as charged in the indictment. It is the People's theory that defendant facilitated the shooting of William Sharpe by identifying him to his killer. If the People cannot establish that defendant had knowledge that it was Michael E.'s intent to kill, not merely injure, Sharpe, defendant lacked the requisite mental state to convict him of second-degree criminal facilitation. In that event, he is subject to conviction of, at most, fourth-degree criminal facilitation, a class A misdemeanor, requiring only the belief that the person to whom aid is rendered probably intends to commit a crime and that the crime the person ultimately commits is a felony (Penal Law § 115.00 [1]).

At trial, the People's evidence of defendant's state of mind immediately prior to the shooting came from two sources. The first was Michael E., who described the meeting during which his services were recruited by Doreen B. in defendant's presence. The second source was the lead prosecutor, who testified that defendant had admitted, during an interview at Arthur Kill Correctional Facility, his knowledge of Michael E.'s murderous intent.

As this Court noted on the first appeal, the People's case was largely dependent on the jury's perception of the credibility of its key witnesses (33 AD3d 432, 433 [2006], *supra*). Michael E.'s testimony had not been effective in securing the conviction of Doreen B. and Ronnie B., and the People concede that he had amassed a substantial criminal history, including robbery and the sale and possession of drugs. By 1998, when Sharpe was murdered, Michael E. had a serious heroin addiction, "doing probably eight bags to ten bags of heroin a day." Michael E. signed a number of inconsistent written statements concerning his participation in the events leading up to the killing, explaining at trial that he first told lies to "[b]uild up my confidence to build up the truth." In the first statement, signed March 27, 1998, he denied any connection with the crime. In the second, signed on April 1, he stated that he had only been recruited by Doreen B. to beat Sharpe. In his third statement, signed on April 2, he admitted involvement in the crime but alleged that the shooter was a person named "Von," "Deshawn" or "Shawn." Shortly thereafter, he signed a fourth statement admitting that he shot Sharpe at Doreen B.'s request.

With respect to defendant's participation in the crime, the account given by Michael E. at trial contradicted both his final written statement and his two-hour videotaped confession. To justify his disparate prior statements, Michael E. stated that he "wasn't feeling comfortable when I first met the detectives" but felt sufficiently comfortable with the assistant district attorney

(ADA) acting as lead prosecutor and "apologized when I cleaned it all up and showed her where the lies were at and eventually told her the truth." With respect to defendant's purported admission, the accounts given by the detective and by the ADA of the statement made by defendant at Arthur Kill Correctional Facility differed significantly in regard to his knowledge of the degree of violence he expected Michael E. to inflict on Sharpe in accordance with Doreen B.'s instructions.

At trial Michael E. testified that Doreen B. told him that Sharpe had robbed one of her drug dealers, and that she wanted Sharpe "shot and killed." Michael E. responded, "I don't do nothing with guns. You know what I do. My hands is my weapons. I fight good." After further discussions in Doreen B.'s apartment, however Michael E. agreed to do the killing for money. Doreen B. sent Ronnie B. to retrieve a bag which contained a handgun. Michael E. testified that as Doreen B. took the bag from Ronnie B., defendant, who goes by the street name "Von" and "Hollywood," entered the room. Doreen B. removed a .38 caliber pistol from the bag, and handed it to Michael E., who said that he did not know the intended victim Sharpe. Michael E. testified that defendant said, "Don't worry, I will show you who he is."

Defendant and Ronnie B. then led Michael E. to the street, where they questioned a man about Sharpe's whereabouts, and learned he was inside a building located at on 144th Street. Michael E. testified that he followed defendant into the building and up a flight of stairs, while Ronnie B. remained outside. Michael E. claimed that upon reaching the fifth floor, defendant gestured toward Sharpe, who was slumped and sleeping on the stairs leading to the roof. Michael E. then fired three shots into Sharpe's head, killing him. According to Michael E., they fled down the stairs, with defendant exiting out the building's back door and Michael E. out the front entrance.

Although Michael E. had told Doreen B. that he did not know Sharpe, upon seeing him asleep on the stairs, Michael E. realized that he and Sharpe had recently exchanged harsh words when he had observed Sharpe sell fake crack cocaine on the street.

At the time of the shooting, Brandon Morgan, Sharpe's cousin, was standing just outside the building's entrance when an upstairs neighbor called down to him that someone had broken a window and was running down the stairs. Morgan testified that he then saw Michael E., who was wearing a denim jacket with a hood, walk out of the building. Morgan confronted Michael E., but Michael E. denied any knowledge of a broken window.

Sharpe's uncle, Clayton Morgan, lived on the first floor of the building on 144th Street. On the morning of January 22, 1998, he heard what sounded like breaking glass. Clayton Morgan assumed that Sharpe, whom he knew was an addict and slept in the stairwell, had broken a window, but did not want to argue with him about it, but decided instead to simply clean up the mess. Morgan took a broom into the hallway, where he began to sweep. He observed a man sneaking down the stairs, whom he assumed was Sharpe. As he did not wish to speak with Sharpe, Clayton Morgan avoided looking at the man as he passed, although he did notice that he wore a dungaree jacket and a hood.

Five days after the murder, Clayton Morgan recognized Michael E. as the man in the stairway at the corner of 143rd Street and Hamilton Place. Notably, Morgan did not testify that he saw defendant in the stairway, thus casting doubt on Michael E.'s testimony that they fled down the stairs together. Police were summoned and Michael E. was apprehended. In subsequent interviews with New York Police Department Detective Cecil Waithe and lead prosecutor ADA Sturm (who at the time of both trials was sitting as a Family Court Judge) Michael E. admitted to being the shooter, but said that he had been accompanied by defendant. Michael E. was charged with murder and incarcerated on Riker's Island, where, in January 1999, he encountered defendant, who was being held on an unrelated narcotics charge. Michael E. contacted Sturm and told her that defendant was the man who had led him to Sharpe at the time of the murder.

On the morning of January 22, 1999, Detective Waithe and Sturm met with defendant at the Arthur Kill Correctional Facility on Staten Island, where an unrecorded interview took place. Pursuant to Sturm's direction no contemporaneous notes were recorded and defendant was not asked to sign a statement.

At trial, Detective Waithe testified that in Michael E.'s initial videotaped statement to investigators, he had stated that he went into the building on West 144th Street by himself. Waithe also testified that Michael E. had told him that he (Michael E.) was "good with his hands." In subsequent interviews, Michael E. said that one of his accomplices in the shooting was nicknamed "Von." Waithe testified that prior to revealing "Von's" involvement in the murder, Michael E. had lied to investigators numerous times, and only came forward with the story about "Von" after sitting in jail for some months.

Detective Waithe further testified that during the Arthur Kill interview, defendant had waived his *Miranda* rights, then told the investigators that Doreen B. had wanted Sharpe, known as

"Butterball," to be "hurt" or beat up for robbing her drug dealer, and that Michael E. had agreed to "do this." As a result, "She wanted him hurt. She wanted to teach him a lesson." Asked on cross-examination if Doreen B. wanted him beaten up, the witness responded, "Beaten up, hurt," adding, "That's it." The detective confirmed that defendant had said only that he led Michael E. to the building where Sharpe was sleeping and "emphatically told me that he did not go into that building with [Michael E.]." Waithe testified that defendant stated that both he and Ronnie B. had agreed to accompany Michael E. in order to identify Sharpe, had made inquiries in order to find out where Sharpe could be found, accompanied Michael E. to the building at 557 West 144th Street but did not instruct Michael E. to enter the building, that Michael E. had entered the building alone, and "that was it."

At trial, Sturm gave a materially different account of the interview from that of detective Waithe. She testified that she was the lead prosecutor in defendant's case, and that at the Arthur Kill interview defendant was Mirandized and waived his rights. In contrast to the detective's testimony, Sturm claimed that defendant told her and Waithe that he was present in Doreen B.'s apartment when Michael E. agreed to kill Sharpe, and had observed Ronnie B. leave the room briefly, then return and give a handgun to Michael E. Sturm testified that the conversation "at that point was that [Michael E.] was going to go and kill Butterball." Because Michael E. was not certain he could identify Sharpe, Ronnie B. had agreed to accompany him to make sure that he "got the right person," and defendant had agreed to accompany the two men in order "to provide back up and muscle." The three then went outside, where Ronnie B. spoke to some people and learned that Sharpe was inside the building on West 144th Street.

Sturm testified that she did not record the Arthur Kill interview because she had believed at the time that recording was not permitted in correctional facilities. Although unable to recall at first, when shown her former testimony, she recalled that she had also told Detective Waithe not to write up a DD5 report following the Arthur Kill interview. She further testified that on the afternoon of the Arthur Kill interview, she had written up a summary of the interview, which she captioned "Abstract of Det. Waithe's Grand Jury Testimony re: 'Von.'" As the investigation developed, an unsigned case summary and voluntary disclosure form (VDF) were also developed.

During cross-examination, defense counsel attempted to question Sturm about the case summary from her office which

contained a written statement that defendant "claims that he didn't know [Michael E.] was going to kill [Sharpe]," which contradicted her trial testimony that defendant stated during the Arthur Kill interview that he knew Michael E. intended to kill Sharpe. Sturm recognized the case summary document, but because 10 years had passed, she could not recall whether she had prepared it or whether it had been prepared by her assistant on the case, ADA Karen Agnifilo. Sturm testified that it was very possible that she had in fact created the case summary, and that since ADA Agnifilo was her only assistant, one of them had created the document. When counsel attempted to question her about the contradictory statement contained in the case summary, he was precluded from further inquiry concerning the contents of the document by the prosecutor's objection.

At the sidebar conference that followed, defense counsel emphasized that what defendant knew or did not know about the extent of the injury intended to be inflicted upon William Sharpe "is the crux of the defense case with regard to this witness . . . given [her] testimony that [defendant] told her that he had knowledge of this. There is a document that was filled out by the District Attorney's office where it clearly says that he never said that." However, the court declined to permit the case summary to be used to impeach Sturm, stating, "She has in some way, in my view, not affirmatively adopted this statement in order for it to be used for impeachment." Due to the uncertainty as to who had prepared the document, the court ruled that unless Sturm's assistant denied preparing it, the case summary could not be used to impeach her testimony. Since the assistant could not recall, stating that it was simply a document "ordinarily produced in a case," the court did not permit counsel to use the case summary to pursue this line of inquiry.

When counsel resumed questioning the witness about the case summary, Sturm stated, "I always placed one of those in what I refer to as the case file." While she could not recall who drafted the document, she only had one assistant. "So if it wasn't me it was her but I don't remember who it was." She conceded that her assistant had not gone to Arthur Kill to interview defendant. Finally, Sturm testified that the other document, designated "abstract," was prepared upon her return from the interview at Arthur Kill (January 22, 1999), that the case summary, while undated, was prepared following grand jury proceedings (culminating in the indictment filed March 23, 1999), and that the case summary "had to have been completed after the last grand jury day because it reflects those grand jury days."

A similar result ensued when counsel attempted to question Sturm regarding the VDF which was filed by her office, and which was dated March 22, 1999, and, though unsigned, included a typewritten notation, "By: Helen Sturm." The VDF stated that defendant had told investigators that he knew Doreen B. wanted Sharpe to be hurt and was present for Michael E.'s receipt of the gun, but did not state that defendant knew Michael E. intended to kill Sharpe. When shown the VDF at trial, Sturm acknowledged that it was possible she had created the document, but she could not state with certainty that she had done so. The court likewise ruled that the witness could not be impeached on the basis of the VDF because she could not recall with certainty that it was she who created it.

The morning after Sturm's testimony, prior to ADA Karen Agnifilo's testimony, the prosecutor informed Supreme Court that he had discovered two different documents entitled "Original Case Report." (The original case report shall be designated as the report which was not produced by the People and the case summary refers to the report received by defendant). The original case report contained the case summary's exculpatory statement that defendant claimed not to have known that Michael E. intended to kill Sharpe, but also contained a typewritten notation—"To: Eugene Porcaro, [Chief of the District Attorney's Trial Bureau] From: Helen Sturm and Karen Friedman [Agnifilo]." The case summary did not contain the above-quoted statement.

The inconsistency concerning what defendant admitted to having known about Michael E.'s intentions towards Sharpe attained even greater significance when ADA Agnifilo testified that she could not recall who prepared the case summary and her inspection of the case summary indicated that the portion of the document containing the exculpatory statement (that defendant had denied knowledge of Michael E.'s intent to kill Sharpe, thereby contradicting Sturm's testimony) may have been copied and pasted from the original case report. Counsel thereupon objected that the typed notation indicating that it was sent to the Chief of the Trial Bureau by *both* Sturm and her assistant was not contained in the version of the case summary that had been provided to him, constituting a *Rosario* violation and warranting the declaration of a mistrial. Upon comparing the undisclosed document to the version furnished to the defense, the trial court observed, "The summary of facts is—I'm not going to go word for word, but suffice it to say it differs." Without ruling whether or not a *Rosario* violation had been made out, the court denied the application for a mistrial,

offering only to recall Sturm to the stand, which offer was declined by the defense. The court also denied an alternative defense motion requesting an adverse inference charge.

Defendant's chief appellate contentions concern the inadequacy of the proof adduced by the People to establish his knowledge that Michael E. intended to kill the victim so as to sustain the conviction for second-degree criminal facilitation. Defendant asserts that the credible evidence demonstrates only that he was aware of a plan to injure Sharpe and that the trial court erred (1) in failing to instruct the jury that the evidence offered by Sturm should be scrutinized with care, particularly as it was contradicted, and (2) in denying him the opportunity to impeach the People's witness with contradictory material contained in the prosecution's case file. Additionally, defendant argues that the failure to disclose the material in the original case report and certain misleading comments made by the prosecutor abrogated his right to a fair trial.

We agree with the majority that reversal is required because of the preclusion of the prior inconsistent statement, which can be reliably attributed to Sturm. Denied the ability to examine Sturm about the exculpatory version of defendant's asserted admission contained in the case summary, counsel also was deprived of the opportunity to make effective use of the material inconsistency to impeach Sturm's trial testimony (*People v Fisher*, 201 AD2d 193 [1994], *lv denied* 84 NY2d 935 [1994]). The error can hardly be considered harmless. Central to defendant's conviction for second-degree criminal facilitation was his alleged knowledge that, when he rendered aid to Michael E. by identifying Sharpe, defendant reasonably expected that Michael E. intended to kill the victim. Given the contradictions between the testimony elicited from the lead detective in the case and the many prior inconsistent statements given by Michael E. concerning defendant's participation in the crime, the strength of the evidence supporting conviction was heavily dependent on the jury's perception of Sturm's credibility.

Moreover, the People's failure to provide the defense with the earlier document, bearing a legend indicating that it was the work product of the ADA as well as her assistant, not only impeded defendant's ability to introduce the case summary for impeachment purposes, violating the prosecution's disclosure obligations under *People v Rosario* (9 NY2d 286 [1961], *cert denied* 368 US 866 [1961]), but also violated *Brady v Maryland* (373 US 83 [1963]).

The *Brady* rule, reflecting a prosecutor's dual role as advocate but also as a public officer, is rooted in due process and a sense

of fairness to the accused, requiring prosecutors to disclose to a defendant all evidence in the prosecutor's possession that is favorable to the defendant (*People v Steadman*, 82 NY2d 1 [1993]). Because the original case report was the work product of Sturm it directly links her to the preparation and recording of defendant's exculpatory statement made at the interview. The People's failure to produce this document before trial deprived defendant of material evidence in his favor and constituted a clear violation of his due process right to a fair trial so as to warrant a finding by this court of a *Brady* violation.

The *Brady* rule applies regardless of the good faith or the bad faith of the prosecutor because "its purpose is not to punish misconduct but to insure that the accused receives a fair trial" (*People v Bryce*, 88 NY2d 124, 129 [1996]). Here, we do not impute any bad faith to the trial prosecutor, nor even to Sturm as the witness, but our concern is that defendant did not receive the disclosure to which he was entitled. The nondisclosure had greater import than possible reputational implications for the prosecutor. That the missing documentation also included inculpatory material potentially relevant to a lesser charge would not detract from its *Brady* character (*DiSimone v Phillips*, 461 F3d 181, 195 [2d Cir 2006]). A *Brady* analysis is undertaken by assessing the omitted evidence in light of the entire record (*United States v Agurs*, 427 US 97, 112 [1976]; *United States v Rivas*, 377 F3d 195 [2d Cir 2004]). We conclude that under the facts of this case, a reversal also would have been warranted for violation of the People's continuing obligation under *Brady* as well as New York's independent due process requirements with respect to the disclosure of exculpatory information to a defendant (*see People v Vilardi*, 76 NY2d 67 [1990]). The exculpatory dimension of *Brady* is present.

Sturm never conceded that she prepared the disclosed documents, the case summary or the VDF, and, in fact, the trial court categorically found that Sturm had not adopted the writings as her own. However, the undisclosed document would show that the original case report was, indeed, the work product of Sturm and her assistant, and was sent to the Chief of the Trial Bureau as such, and that the information used to prepare the case summary most likely came from the original case report. This document would have disclosed what defendant told Sturm at the interview concerning his knowledge of Michael E.'s intent as recorded by Sturm. Because Michael E.'s credibility was unreliable, the only competent evidence to implicate defendant in the charged crimes was Sturm's testimony concerning defendant's alleged admission of his knowl-

edge of Michael E.'s intent to kill Sharpe. This undisclosed evidence, however, would have significantly undermined Sturm's testimony in this regard. Further, the People's case against defendant, which mainly hinged on Sturm's testimony, would have been drastically compromised by the undisclosed document. Without defendant's purported admission, the People's case would rest primarily on the statement of Michael E., whose testimony was not even sufficiently credible as to convict Doreen B., who actually orchestrated Sharpe's murder.

The original case report which contradicted Sturm's testimony, and substantiated defendant's claim that he did not know of Michael E.'s intent to kill Sharpe, was *Brady* material because it is "inconsistent with a fundamental aspect of the People's case" (*People v Garcia*, 46 AD3d 461, 462 [2007]) and was clearly material evidence in defendant's favor "because it is impeaching" (*DiSimone v Phillips*, 461 F3d at 195). Moreover, the veracity of the undisclosed document is enhanced insofar as it corresponded with Detective Waithe's testimony. Thus, we conclude that the People's failure to produce the report, which was consistent with defendant's claim of innocence with respect to the charged crimes, and which contradicted Sturm's testimony to the contrary, to the defense before trial violated their *Brady* obligation.

The issue was not preserved. However, it is hardly unprecedented for an appellate court to review it in the interest of justice or to analyze several errors, rather than focusing on only a single reversible error. We address this because as an appellate court we should identify an issue, clearly manifested in the record, which substantially impacted defendant's ability to prepare and present a defense. Our concern is enhanced under the circumstances of this case where the credibility was so centrally in issue, that the outcome at the trial could have been very different if evidence in the People's possession that conceivably undermined the prosecution's case based on defendant's alleged admission had been presented to the jury. We believe that had the jury known that the People's own documentation reflected defendant's exculpatory statement as recorded by Sturm, rather than only a seemingly unchallenged asserted admission, there is a reasonable likelihood it would have reached different conclusions in its judgments on witness credibility, a crucial issue in this case. A defendant's ability to utilize exculpatory information in the People's possession goes to the heart of the *Brady* rule. Hence, our appellate review should be efficiently comprehensive to address, and not ignore or disregard, a *Brady* violation which clearly denied defendant's constitutional right to a fair trial.

Since only Michael E., the admitted shooter who had entered a cooperation agreement with the People (notwithstanding his claim that his testimony was not affected thereby), connected defendant with the crime, the outcome of this case turned in significant part on the nature of defendant's purported admissions and the prosecutor's decision to base the People's case on his admissions. Especially in view of Michael E.'s questionable credibility as a result of his concededly different, inconsistent statements given to the police, and the conflict to which we alluded in our prior decision (33 AD3d 432 [2006], *supra*) between Detective Waithe's testimony and that of Sturm, whose testimony relied on records under her control, regarding the extent of defendant's admissions of culpability, the missing documentation would have provided valid material evidence in a *Brady* context (*Giglio v United States*, 405 US 150, 154-155 [1972]; *People v Colon*, 13 NY3d 343 [2009]) that might have added sufficient doubt to the People's case (*People v Hunter*, 11 NY3d 1 [2008]) so as to create the reasonable possibility of a different verdict (*People v Colon*, 13 NY3d 343 [2009], *supra*; *People v Vilardi*, 76 NY2d 67 [1990], *supra*). We would reach the same result even under the more stringent reasonable probability standard (*People v Bryce*, 88 NY2d 124 [1996], *supra*).